**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR-05-403-PHX-DGC |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Dale Washington Orman, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

Defendant Dale Washington Orman has been charged with the crime of felon in possession of a firearm. Doc. #1. Defendant was arrested on August 20, 2004, when he was found to be carrying a concealed handgun in the Paradise Valley Mall in Phoenix, Arizona. Defendant has filed a motion to suppress, the Government has filed a response, and Defendant has filed a reply. Docs. ##15, 22-23. The Court held an evidentiary hearing on November 23, 2005. Doc. #24. Seven witnesses testified and Defendant presented several exhibits. For the reasons set forth below, the Court will grant the motion to suppress in part.

**Factual Background**

The Court heard conflicting testimony from several officers and Defendant. The Court found the officers' testimony to be more credible. As a result, the Court has resolved several factual disputes in the Government's favor. The facts that follow

1    represent the Court's findings based on these credibility determinations.

2            On August 20, 2004, Officer John Ferragamo of the Phoenix Police Department was

3    working as an off-duty police officer at the Paradise Valley Mall ("Mall").  Officer Brody

4    Tomasi was working in the same capacity at the Mall.

5            At approximately 3:45 p.m., Officer Ferragamo was contacted by the Mall's security

6    director, Donald Hoskinson, who informed Officer Ferragamo that he had received a radio

7    call from another Mall security officer.  The calling officer reported that an employee of the

8    local electric utility, Arizona Public Service ("APS"), had been working outside the Mall

9    and had seen a man place a handgun in his boot and enter the Mall.  The APS employee

10   described the man as white, wearing a white tank top, and covered with tattoos.  From the

11   description of events it was also apparent that the man was wearing boots.  The APS

12   employee reported that the individual had entered the southwest side of the Mall near

13   Starbucks.  The APS employee wished to remain anonymous.[1]

14           On the basis of this report, Officer Ferragamo accompanied Mr. Hoskinson in

15   walking through the Mall and looking for the individual in question.  While doing so, the

16   officer received a radio report that another security officer had seen an individual meeting

17   the description near the Dillard's department store on the northeast end of the Mall.  As

18   Officer Ferragamo entered this area, he saw a white male in a white tank top, covered with

19   tatoos, walking toward him.  Officer Ferragamo made eye contact with the individual,

20   approached him, and said words to the effect: "Excuse me, sir, may I speak to you?"  At

21   this point Officer Ferragamo was standing six to eight feet from the individual.  The

22   individual to whom he was speaking, who later turned out to be Defendant, responded

23   "sure."    Because other patrons of the Mall were walking through the area, Officer

24

25           [1] Mr. Hoskinson could not recall at the hearing whether the APS employee had

26   reported his observations to a Mall security person or maintenance employee.  Officer

27   Ferragamo testified that he was told the report had been made to a Mall security officer.
     Because the inquiry in this motion is whether Officer Ferragamo possessed reasonable

28   suspicion or probable cause, the Court will focus on what he knew.

1    Ferragamo motioned to the right side of the walkway and suggested they step out of the
2    foot traffic in order to converse.

3        Once they had stepped to the side, near the front window of a store, Officer
4    Ferragamo stepped closer to Defendant and informed him that the officer had information
5    Defendant might be carrying a gun in the Mall.  Officer Ferragamo asked if this was true.
6    Defendant confirmed that he was carrying a weapon and apologized.   Although the APS
7    employee had reported that the gun was placed in a boot, Officer Ferragamo could not see
8    a bulge in Defendant's boots.  He did see a small bulge under Defendant's shirt.   Officer
9    Ferragamo asked Defendant where the gun was located.   Defendant pointed to the bulge
10   in his shirt. Officer Ferragamo then retrieved the weapon from Defendant's waistband.

11       During this encounter Officer Ferragamo stood close to Defendant.  He did not draw
12   his service weapon.   He was carrying a black radio in his right hand.   The conversation
13   occurred in a cordial tone.   Defendant was calm and cooperative.   The entire conversation
14   lasted three or four minutes.

15       Although Mr. Hoskinson had walked through the Mall with Officer Ferragamo, he
16   stopped before Officer Ferragamo reached Defendant.  He did not participate in the contact
17   or the conversation.   Rather, after Defendant and Officer Ferragamo had stepped to the
18   side, Mr. Hoskinson stood in the center of the hallway, about 20 feet away, watching the
19   conversation.   As Defendant was facing Officer Ferragamo, Mr. Hoskinson would have
20   been behind and slightly to the left of the officer, but within Defendant's view.   Mr.
21   Hoskinson was wearing business clothes.   He was not carrying a weapon or wearing a
22   badge.

23       Officer Tomasi was located in a different part of the Mall when Officer Ferragamo
24   was informed of the report from the APS employee.  Listening to his radio, Officer Tomasi
25   walked to the northeast end of the Mall, arriving on the scene after Officer Ferragamo had
26   made contact with Defendant.   Officer Tomasi stopped approximately ten feet away from
27   Officer Ferragamo and Defendant in order to monitor the surrounding circumstances.   He
28   was standing to the left and rear of Defendant.   He did not participate in the contact or

1   securing of the weapon.  His gun was not drawn.

2        Two additional police officers, Roger Larson and Oscar Bernal, entered the Mall

3   after being informed by a Mall security officer that there was an individual in the Mall

4   carrying a gun.   Officer Larson approached Officer Ferragamo as he was speaking with

5   Defendant and after Officer Ferragamo had retrieved Defendant's gun.  Officer Larson did

6   not participate in the conversation.  He observed that the conversation was calm and that

7   Defendant was cooperative.  He saw no coercion.

8        Officer Bernal also observed the conversation between Defendant and Officer

9   Ferragamo.  He testified that it looked like a casual conversation.

10       Defendant's wife was in the Mall with him.  She was standing nearby during his

11  conversation with Officer Ferragamo.  Officer Larson spoke with Defendant's wife in the

12  Mall and later in the Mall security office.  She reported that the gun belonged to her and

13  that she had asked her husband to carry it.  She handed Officer Larson a paper indicating

14  that her civil rights had been restored, but reported that neither she nor Defendant had a

15  permit to carry a concealed weapon.  Officer Larson asked if Defendant was a prohibited

16  possessor, and she said yes.  Officer Larson could not recall if Defendant's wife conveyed

17  this information in the Mall or later in the security office.

18       After obtaining Defendant's gun, Officer Ferragamo informed Defendant that he

19  wanted to continue the conversation in the Mall security office.  Defendant agreed.

20  Defendant and his wife then accompanied Officers Ferragamo and Tomasi in walking

21  several hundred yards to the security office.  Defendant was not handcuffed and was not

22  told that he had been placed under arrest.  During the walk to the security office Officer

23  Ferragamo asked Defendant his name, address, date of birth, and social security number.

24  He did not ask further questions about the weapon.

25       Officer Ferragamo provided the following testimony about events that occurred

26  upon the group's arrival at the security office:

27       Q.    When you reached the security office, what occurred then?

28       A.    I advised Mr. Orman he was under arrest for carrying a concealed

                                   - 4 -

1    weapon in the mall and I told him because we're in a secure, locked
2    office and Officer Tomasi was there, I wasn't going to place him in
    handcuffs, just asked him to have a seat in the chair.

3    Q.    What did you do next?

4    A.    With this personal information I conducted some records checks.

5  Hr'g Tr. at 16.

6        After completing the records check, Officer Ferragamo read Defendant his *Miranda*

7  rights and interviewed him.  Defendant confirmed that he had several prior arrests and that

8  he had served time in prison.  He explained that the firearm belonged to his wife, that he

9  and his wife had driven to the Mall in an older Bronco that had no top, and that he had

10  taken the gun into the Mall because he did not want to leave it in the open vehicle.

11               **Discussion**

12    **A.**    **Did the Initial Stop Violate Defendant's Fourth Amendment Rights?**

13        Defendant contends that his initial encounter with Officer Ferragamo constituted

14  an investigative stop and a seizure under the Fourth Amendment.  Such a stop does not

15  violate the Fourth Amendment "if the officer's action is supported by reasonable suspicion

16  to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273

17  (2002) (quotations and citations omitted).  If an encounter is purely consensual and does

18  not rise to the level of an investigatory stop, it falls "outside the gambit of the Fourth

19  Amendment's guarantee against unreasonable searches and seizures[.]" *United States v.*

20  *Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994).

21        The Court concludes that Officer Ferragamo's initial encounter with Defendant was

22  consensual and not an investigatory stop requiring Fourth Amendment protection.  The

23  officer approached Defendant in a public place, surrounded by other Mall patrons, and

24  asked if he could speak to Defendant.  Defendant agreed.  Officer Ferragamo suggested

25  that they step to the side, out of the way of foot traffic, and the ensuing conversation was

26  calm and non-coercive.  Defendant participated in the conversation voluntarily.  Such a

27  consensual encounter between law enforcement and a citizen does not implicate Fourth

28  Amendment concerns. *Id.*

1    Defendant testified that the encounter was coercive and forceful.  He asserted that

2    Officer Ferragamo approached Defendant swiftly, spoke in a commanding voice, had his

3    hand on his weapon, backed Defendant against a wall, and "got in his face."  He testified

4    that he could not leave.  This description of events is contradicted by the testimony of

5    Officers Ferragamo, Tomasi, Larson and Bernal, and Mr. Hoskinson, all of whom the Court

6    found to be credible.  The Court concludes that the conversation in the Mall was

7    consensual.

8         Even if Officer Ferragamo's initial contact with Defendant constituted an

9    investigative stop, the Court finds it to be supported by reasonable suspicion.  Officer

10   Ferragamo received news that a third party – an APS employee – had seen a person carry

11   a gun into the Mall.  The Ninth Circuit has held that "[f]or a third-party report of suspected

12   criminal activity to form the basis of an officer's reasonable suspicion, that report must

13   possess sufficient indicia of reliability."  *United States v. Fernandez-Castillo*, 324 F.3d

14   1114, 1117 (9th Cir. 2003).  The Court finds that the report from the APS employee was

15   sufficiently reliable to pass constitutional muster.

16        Mr. Hoskinson reported to Officer Ferragamo that the APS employee wanted to

17   remain anonymous.  The Supreme Court has held that purely anonymous tips cannot form

18   the basis for reasonable suspicion.  *See Florida v. J.L.*, 529 U.S. 266, 270 (2000).  The Ninth

19   Circuit has further explained, however, that "[w]hile 'a tip might be anonymous in some

20   sense, it may have' certain other features, either supporting reliability or narrowing the

21   likely class of informants, so that the tip does provide the lawful basis for some police

22   action." *United States v. Terry-Crespo*, 356 F.3d1170, 1174 (9th Cir. 2004) (quoting *Florida*,

23   529 U.S. at 275 (Kennedy, J., concurring)).  For example, an informant identified as an

24   employee of the Montana Department of Transportation was not regarded by the Ninth

25   Circuit as purely anonymous.  *Fernandez-Castillo*, 324 F.3d at 1118; *see Terry-Crespo*, 356

26   F.3d at 1174.  In this case, the informant was identified as an employee of APS working at

27   the Mall.  Like the Montana Department of Transportation information conveyed in

28   *Fernandez-Castillo*, this information narrowed the likely class of informants – the tip was

1    not purely anonymous.

2         The Ninth Circuit also accords greater reliability to tips from individuals who expose

3    themself to some legal sanction by making the report.  "'If an informant places his

4    anonymity at risk, a court can consider this factor in weighing the reliability of the tip.'"

5    *Terry-Crespo*, 356 F.3d at 1176 (quoting *Florida*, 529 U.S. at 276 (Kennedy, J., concurring)).

6    Officer Ferragamo testified that he could have identified the APS employee by determining

7    which APS employees were working at the Mall that day.  The employee's willingness to

8    place his anonymity at risk by reporting to Mall personnel, thereby exposing himself to

9    possible legal sanction if the tip was false, adds a measure of reliability to his tip.  *Id.*[2]

10        Moreover, the information received by Officer Ferragamo made clear that the tip

11   contained current information.  The APS employee reported that he had observed the

12   subject place a gun in his boot and enter the southwest door of the Mall.  His immediate

13   report to Mall security reflected the contemporaneous nature of the information, a currency

14   that was confirmed when Mall security personnel promptly located an individual matching

15   the unique characteristics described by the employee.  The Ninth Circuit has recognized

16   that "reports made contemporaneously with a complainant's observations are generally

17   more reliable than those reports made later in time."  *Fernandez-Castillo*, 325 F.3d at 1119.

18        Finally, this was not an informant tip that was "devoid of specifics," a shortcoming

19   that often undermines the reliability of anonymous reports.  *Id.* at 1123.  The report

20   described the subject in some detail, including the fact that he was white, wearing boots,

21   wearing a white tank top, covered with tattoos, and in the Mall.  This level of detail adds

22   to the reliability of an informant's report.  *Id.* at 1123.

23   _____

24        [2] Defense counsel argued during the evidentiary hearing that the officer's ability to
     locate the employee is irrelevant in this case because Officer Ferragamo never actually
25   located him.  But it is not the actual identification of the informant that the Ninth Circuit has
     found significant.  Rather, it is the informant's willingness to place himself at risk of being
26   identified and sanctioned if the his tip is false that gives credence to his report.  *Id.*  By
     reporting his observations to Mall personnel in this case, the APS employee placed himself
27   at risk of sanction, adding some degree of reliability to his tip.

28

1    When evaluating an investigatory stop, the Court must look at the totality of the
2    circumstances to determine whether the officer had a particularized and objective basis for
3    suspecting wrongdoing.  *Arvizu*, 534 U.S. at 273.  "Although an officer's reliance on a mere
4    'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to
5    the level required for probable cause, and it falls considerably short of satisfying a
6    preponderance of the evidence standard."  *Id.* at 274 (quotations and citations omitted).
7    Considering the facts set forth above, the Court concludes that the report from the APS
8    employee contained sufficient indicia of reliability to provide Officer Ferragamo with a
9    "reasonable suspicion to believe that criminal activity may be afoot."  *Id.* at 273.  Thus,
10   even if the officer's initial contact with Defendant constituted an investigatory stop, it did
11   not violate the Fourth Amendment.

12            **B.       Was Defendant's Arrest Unconstitutional?**

13   Officer Ferragamo did not inform Defendant he was under arrest until they reached
14   the Mall security office.  The officer testified, however, that in his view Defendant was
15   under arrest and no longer free to leave once he had been found carrying a concealed
16   weapon in the Mall.  Although Officer Ferragamo formed this mental conclusion while still
17   in the Mall conversing with Defendant, he did not place Defendant under arrest or restrain
18   Defendant or otherwise alter his course of action to suggest that Defendant's status had
19   changed.  Rather, he informed Defendant that he would like to continue the conversation
20   in the Mall security office and Defendant agreed to accompany him there.

21   Defendant argues that an arrest occurred at the point when Officer Ferragamo
22   formed the mental intent to arrest Defendant, even if the officer's actions did not change
23   at that time.  The Court cannot agree.  To identify when an arrest occurs the Court must
24   look at objective criteria to determine whether a reasonable person in Defendant's position
25   would consider himself under arrest.  *See United States v. Mendenhall*, 446 U.S. 544, (1980)
26   (Stewart, J., concurring) ("[A] person has been 'seized' within the meaning of the Fourth
27   Amendment only if, in view of all the circumstances surrounding the incident, a reasonable
28   person would have believed that he was not free to leave."); *Florida v. Royer*, 460 U.S. 491,

502 (1983) (quoting *Mendenhall*); *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("Our cases make clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual[.]") (citation omitted). Factors to consider include the length of the stop, "the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 544; *see United States v. Sharpe*, 470 U.S. 675, 685 (1985) (stating that the length of the stop is a relevant factor).

In this case, no such objective factors existed while Officer Ferragamo was speaking with Defendant in the Mall. The entire conversation lasted three or four minutes. Defendant was not restrained; he had agreed to talk to the officer; the conversation was calm and cordial and occurred in a public place with other Mall patrons in the immediate vicinity. Officer Ferragamo did not draw his gun, did not tell Defendant he was restrained from leaving, and did not otherwise act coercively. Based on these facts, a reasonable person would not believe he was under arrest. *See Mendenhall*, 446 U.S. at 555 ("The respondent was not seized simply by reason of the fact that the agents approached her, asked if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the questions was a law enforcement official."); *Sharpe*, 470 U.S. at 687 (holding that a 20-minute detention of a suspect did not constitute an arrest where the agent conducted his investigation in a diligent and reasonable manner).

Officer Ferragamo did place Defendant under arrest upon arriving at the Mall security office. To be valid under the Fourth Amendment, this arrest must have been supported by probable cause to believe Defendant had committed a crime. *See United States v. Marion*, 404 U.S. 307, 320 (1971) ("To legally arrest and detain, the Government must assert probable cause to believe the arrestee has committed a crime."); *Mallory v. United States*, 354 U.S. 449, 456 (1957) ("[W]homever the police arrest they must arrest on

1   'probable cause.' It is not the function of the police to arrest . . . at large and to use an

2   interrogating process at police headquarters in order to determine whom they should

3   charge before a committing magistrate on 'probable cause.'"). The Court concludes that

4   the arrest at the security office was not supported by probable cause. At the time of arrest,

5   Officer Ferragamo knew only that Defendant was carrying a concealed weapon. But

6   carrying a concealed weapon is not a crime in Arizona if the person has a permit. Officer

7   Ferragamo did not ask Defendant if he had a permit prior to the arrest, nor did he ask if

8   Defendant was a prohibited possessor. The officer testified that he asked these questions

9   only after Defendant was arrested.[3]

10   Although Officer Larson talked with Defendant's wife about the lack of permits and

11   Defendant's status as a prohibited possessor, Officer Larson could not recall whether this

12   conversation occurred in the Mall or later at the security office. Thus, his testimony

13   cannot be used to establish that the officers knew the information before Defendant was

14   placed under arrest upon arriving at the security office.

15   Officer Ferragamo testified that Defendant should have produced a concealed

16   weapon permit if he had one, implying that his failure to do so provided a reasonable basis

17   for concluding he did not have one. The defense investigator, David Toledo, testified at

18   the hearing and produced a copy of his Arizona concealed weapon permit, which stated

19   on the back that it must be shown to a police officer "upon request." The Court cannot

20   conclude that Defendant's failure to produce a permit without request provided probable

21   cause to believe he had committed a crime. *See United States v. Grant*, 476 F. Supp. 400,

22   405 (S.D. Fla. 1979) (probable cause did not exist because "[t]he informant had not

23

24   [3] Defendant, on the other hand, testified that Officer Ferragamo asked him in the

25   Mall if he had ever been "busted" or "done hard time." Defendant testified that he responded yes to both questions and told the officer he had been in prison in New Jersey.

26   This testimony, if accepted, arguably would provide probable cause to believe Defendant had been convicted of a felony and therefore was a prohibited possessor. As noted

27   above, however, the Court finds Officer Ferragamo's version of the encounter to be more

28   credible.

- 10 -

1   indicated to the agents that Grant was a convicted felon, or did not have a permit for his

2   weapons, or that they were otherwise illegal."); *cf. United States v. Adams*, 225 F. Supp. 2d

3   86, 90, 94 (D. Maine 2002) (holding that a police officer had probable cause to believe that

4   the defendant was unlawfully carrying a weapon in a vehicle where "he asked her if she

5   had a concealed weapons permit, and she said she did not").

6          Because the Court concludes that the arrest of Defendant in the security office was

7   invalid, all evidence procured as a result of that arrest must be suppressed. *See Segura v.*

8   *United States*, 468 U.S. 796, 804 (1984) ("Under this Court's holdings, the exclusionary rule

9   reaches not only primary evidence obtained as a direct result of an illegal search or seizure,

10  but also evidence later discovered and found to be derivative of an illegality or 'fruit of the

11  poisonous tree.'") (citations omitted).   The Court therefore will order the suppression of

12  information obtained by the Government that cannot be shown to have been obtained

13  before Defendant was arrested upon his arrival at the security office. *See Wong Sun v.*

14  *United States*, 371 U.S. 471, 485 (1963) ("[V]erbal evidence which derives so immediately

15  from an unlawful entry and an unauthorized arrest . . . is no less the 'fruit' of official

16  illegality than the more common tangible fruits of the unwarranted intrusion.").

17         **C.      *Miranda* rights.**

18         Defendant also argues that his *Miranda* rights were violated by questioning in the

19  Mall.   *Miranda* applies, however, only to custodial interrogations.   *See Miranda v.*

20  *Arizona*, 384 U.S. 436, 444 (1966) ("[T]he prosecution may not use statements . . . stemming

21  from *custodial interrogation* of the defendant unless it demonstrates the use of procedural

22  safeguards effective to secure the privilege against self-incrimination.") (emphasis added);

23  *Krantz v. Briggs*, 983 F.2d 961, 963 (9th Cir. 1993) ("The rules of police procedure

24  established by *Miranda v. Arizona* apply only to 'custodial interrogation.'"), *overruled*

25  *on other grounds by Thompson v. Keohane*, 516 U.S. 99 (1995).   The questioning in the

26  Mall was consensual, not custodial.   Defendants rights therefore were not violated by the

27  Mall encounter.   *See United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir.

28  2005) ("Rodriguez-Preciado's admission to possessing cocaine was not made during a

custodial interrogation, and therefore the fact that he was not given *Miranda* warnings prior to this admission does not require suppression."). The Court need not address the later questioning in the security office because it occurred after the invalid arrest and therefore will be suppressed.

**IT IS ORDERED** that Defendant's motion to suppress (Doc. #15) is **granted in part** and **denied in part** as set forth above.

DATED this 9th day of December, 2005.

David G. Campbell
United States District Judge